## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FINCANTIERI S.p.A.
c/o Naval Vessels Unit
via Cipro 11-16129
Genoa, Italy,

                Plaintiff,

    vs.

LOCKHEED MARTIN CORPORATION
c/o Maritime Systems and Training Unit
300 M Street, S.E.
Washington, D.C. 20003,

                Defendant.

Civil Action No. _____

## COMPLAINT FOR INJUNCTIVE RELIEF

Plaintiff FINCANTIERI S.p.A., formerly known as Fincantieri-Cantieri Navali Italiani S.p.A., (collectively "Fincantieri"), by and through its undersigned counsel, hereby submits this Complaint against Defendant, Lockheed Martin Corporation, and alleges as follows based upon personal knowledge:

## PRELIMINARY STATEMENT

1.    Fincantieri seeks injunctive relief to prevent the irreparable injury it would suffer from Lockheed Martin's plans to breach the terms of a contract involving the construction of Multi-Mission Surface Combatants ("MMSCs"), a variant of the Littoral Combat Ship ("LCS"), for the Kingdom of Saudi Arabia (the "Saudi Opportunity"). This impending breach continues Lockheed's course of conduct of recent breaches, for which Fincantieri also seeks relief. Absent an injunction, Fincantieri will lose contractual opportunities it has invested significant resources to secure with Lockheed, causing Fincantieri and its Marinette Marine Corporation ("MMC") subsidiary in Wisconsin to suffer devastating consequences.

2.      The contract at issue is a Teaming Agreement between Lockheed Martin and Fincantieri that required each company to promote and advance the other's bids.  Fincantieri was obligated to take steps to help ensure Lockheed won the prime contract, and Lockheed was obligated to ensure MMC won the sub-contract.  This arrangement largely worked as planned until recently when the Saudi Arabian and United States Governments announced a major military arms agreement that includes Lockheed designing and constructing four ships based upon the LCS design.  Under the Teaming Agreement, Lockheed was contractually obligated to subcontract with MMC for construction of these ships—a huge project.  Despite Fincantieri's multiple requests for reassurance from Lockheed that it would indeed comply with its obligations under the Teaming Agreement and not seek proposals or subcontract arrangements with other shipyards for the Saudi Opportunity—which was questionable based on Lockheed's past behavior—Fincantieri received no response.  Lockheed's refusal to confirm its commitment to adhere to the Teaming Agreement constituted an actionable failure to provide adequate assurances of performance.

3.      Then, in a letter dated June 12, 2017, and during a meeting two days later, Lockheed Martin boldly admitted that it had sought proposals for the Saudi Opportunity from one or more subcontractors other than MMC, with the intent to award the Saudi Opportunity subcontract to a third-party shipyard.  This solicitation of proposals directly violated the Teaming Agreement, and for Lockheed actually to proceed with a subcontractor other than MMC would also be a breach.

4.      Injunctive relief is necessary and appropriate to prevent Lockheed Martin from compounding its misconduct by subcontracting (if it has not done so already) and proceeding to work on the Saudi Opportunity with a shipyard other than MMC—which would be in further breach of the Teaming Agreement. Given the tremendous investment Fincantieri and MMC have made to support the Teaming Agreement, Lockheed's action would have a devastating impact on

them. Not only would Fincantieri and MMC be deprived of the revenue that would flow from the Saudi Opportunity, they would also be prevented from participating in any follow-on Saudi orders, and from developing the infrastructure and capability necessary to compete for an anticipated U.S. Navy program.

5.      This loss of a bargained-for opportunity is a quintessential form of irreparable injury.  So is the need to lay off a substantial number of employees, if not shutter an entire shipyard, which both would be likely consequences if Lockheed Martin is permitted to subcontract with another shipbuilder in violation of the Teaming Agreement.  The balance of equities of the requested injunction plainly favors Fincantieri, given that it poses no real threat of injury to Lockheed, but rather requires only that Lockheed honor a contractual agreement.  Likewise, by preserving the jobs of many Wisconsin-based employees, and by enforcing a valid contract, the injunction would also advance the public interest.

6.      Because the Teaming Agreement contains an arbitration clause, Fincantieri seeks a preliminary injunction pending completion of an arbitration on the merits of whether Lockheed Martin has anticipatorily repudiated and/or already breached the Teaming Agreement.  Fincantieri is instituting arbitral proceedings contemporaneously with this Motion.  However, it is not realistically feasible that the arbitral tribunal could be constituted or act speedily enough to timely enjoin Lockheed and thus prevent the irreparable harms that face Fincantieri from Lockheed's impending actions.  In this scenario, the Court is empowered to enter an order maintaining the status quo pending arbitration, consistent with the Federal Arbitration Act.[1]

---

[1] Although Fincantieri anticipates that this matter will be decided on the merits via arbitration, this Complaint pleads its claims if the parties waive arbitration and proceed in this Court instead.

7.     For these reasons, Fincantieri requests that the Court preliminarily enjoin Lockheed Martin from awarding and/or proceeding with a subcontract for the Saudi Opportunity with any shipbuilder other than MMC pending the conclusion of arbitration of this matter.

## JURISDICTION AND VENUE

8.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(2) (2012) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

9.     The Court has personal jurisdiction over Lockheed Martin under D.C. Code §§ 13-423(a)(1) & (3) (D.C. Long-Arm Statute) because it regularly and continuously transacts business in this district through a business unit located here, it committed acts in this district that are the focus of the Complaint, and it caused harm to Fincantieri through these acts.

10.    Venue is proper in this Court under 28 U.S.C. §§ 1391(b)(1)-(2) (2012) because the principal place of business of Lockheed Martin's pertinent business unit is in this district and a substantial part of the events giving rise to the claims herein occurred in this district.

## PARTIES

11.    Plaintiff Fincantieri is a corporation established and headquartered in Italy. It is a world-class shipbuilder, capable of constructing a wide range of ship types, including complex vessels with high technological content.  Since its formation in 1959, Fincantieri has successfully constructed many ships for the U.S. Navy and other naval fleets across the globe.   Fincantieri's United States subsidiary, MMC, is a shipyard in Wisconsin that constructs the LCS vessels.

12.    Defendant Lockheed Martin is a Maryland corporation headquartered in Maryland that acted at all pertinent times through its Maritime Systems and Training business unit located in Washington, D.C.  Lockheed is a major U.S. government contractor with global operations that

procure contracts related to aerospace, defense, security, and advanced technologies.  It is also a

designer, producer, and integrator of shipboard electronic systems and ship automation systems.

## FACTUAL ALLEGATIONS

### Fincantieri Is Lockheed Martin's Exclusive Teammate in the U.S. Navy's LCS Program

13.     The U.S. Navy's Littoral Combat Ship ("LCS") Program, announced in November

2001, is a "bold departure from traditional Navy shipbuilding programs."  U.S. Navy Fact File,

*Littoral   Combat   Ships–Fleet   Introduction   and   Sustainment–LCS*   (May   5,   2017),

http://www.navy.mil/navydata/fact_display.asp?cid=4200&ct=4&tid=1650.     Under   the   LCS

concept, relatively small and inexpensive surface combatant ships would be developed, with each

LCS base model being designed to accept modular "plug-and-fight" mission packages.  Ronald

O'Rourke, Cong. Research Serv., RL33741, *Navy Littoral Combat Ship/Frigate (LCS/FF)*

*Program:          Background          and          Issues          for          Congress*   1-2   (2017),

https://fas.org/sgp/crs/weapons/RL33741.pdf.  Operating   primarily   in   littoral   (*i.e.*,   near   shore)

waters, these mission packages permit a LCS to be outfitted to focus on a particular mission, such

as antisubmarine warfare, mine countermeasures, or surface warfare against small boats, versus

the U.S. Navy's traditional, larger multi-mission ships.  *Id.*  It is anticipated that a later phase of

the program not yet awarded will also involve developing naval frigates based upon the LCS

design (the "Frigate Program").  *Id.* at 1.

14.     Transforming the U.S. Navy's fleet to operate in shallow waters is critical. As then

Chief of Naval Operations Admiral Mike Mullen described it, "LCS is needed now to fill critical,

urgent warfighting requirement gaps that exist today. It is imperative that the Navy deliver this

warship class and its important capabilities to the fleet as soon as possible." America's Navy,

*Secretary   of   the   Navy   Recommends   Way   Ahead   for   the   LCS   Program*   (Mar.   15,   2007),

http://www.navy.mil/submit/display.asp?story_id=28345. "The LCS is an entirely new type of U.S. Navy warship. A fast, agile, and networked surface combatant, LCS's modular, focused-mission design will provide combatant commanders the required warfighting capabilities and operational flexibility to ensure maritime dominance and access for the joint force." *Id.* As recently as April 28, 2017, eight sitting U.S. Senators expressed their continued support for the LCS Program to the Secretary of Defense because they are committed "to ensuring that the [U.S.] Navy is best equipped to meet every future challenge." Letter from Senators Strange, Johnson, Baldwin, Nelson, Rubio, Peters, Shelby, and Stabenow, U.S. Senate, to James Mattis, Sec'y, Dep't of Defense (Apr. 28, 2017), https://news.usni.org/2017/05/01/document-senate-letter-secdef-mattis-littoral-combat-ship-program.

15.     To develop the LCS program, two industry teams—led respectively by Lockheed Martin and General Dynamics—were awarded prime contracts by the U.S. Navy on May 27, 2004, with each designing a different version of the LCS. Lockheed's version was deemed the "Freedom" class of LCS, while General Dynamics' version was dubbed the "Independence" class. The Navy intends to procure 40, and possibly as many as 52, Small Surface Combatants, a combined term referring to both LCS and the frigates to be designed under the Frigate Program, with a current proposed breakdown of either 28 LCS and 12 frigates, or 30 LCS and 10 frigates, depending upon when production shifts from one ship type to the other. Ronald O'Rourke, Cong. Research Serv., RL33741, *Navy Littoral Combat Ship/Frigate (LCS/FF) Program: Background and Issues for Congress* 1-2 (2017), https://fas.org/sgp/crs/weapons/RL33741.pdf. As of May 2017, eight LCS had been commissioned into service and a ninth LCS was awaiting commissioning.

16.     Lockheed Martin, in turn, initially entered teaming agreements with two subcontractors—Bollinger Shipyards, Inc. ("Bollinger") in April 2003 and MMC in May 2003—to develop and pursue variants of its Freedom class of LCS.  On March 28, 2008, Fincantieri (under its former name, Fincantieri-Cantieri Navali Italiani S.p.A.) signed a teaming agreement with Lockheed in anticipation of Fincantieri's acquisition of MMC's parent company (the "Teaming Agreement"), and MMC later became Fincantieri's majority-owned subsidiary.  Exhibit 1 hereto. The Teaming Agreement was amended on April 11, 2014 by Lockheed Martin and FINCANTIERI, S.p.A. (the "Amendment").  Exhibit 2 hereto.

17.     The Teaming Agreement references the "Marinette Shipyard," a defined term meaning "the shipyards located at Marinette and Sturgeon Bay, Wisconsin, formerly owned and operated by the Manitowoc Company as the Marinette Marine Corporation and Bay Shipbuilding Company." Ex. 1, Art. 2.D. The Teaming Agreement further specifies that "the Marinette Shipyard shall be the subcontractor on the LCS Program." *Id.* Art. 3.4. Bay Shipbuilding Company is not involved in the events described herein.  As detailed in the April 11, 2014 Amendment to the Teaming Agreement, MMC is the shipyard through which Fincantieri participates in LCS opportunities.  Amendment (Ex. 2) ¶ 1.

18.     The U.S. Navy ordered its first Freedom class LCS, designated LCS-1, from Lockheed Martin on or about December 15, 2004 under a $188.2 million cost-plus award-fee/incentive-fee contract. Under the May 2003 teaming agreement, MMC was to design and construct LCS-1 in partnership with Lockheed.

19.     One and a half years later, in June 2006, the Navy ordered its second Freedom class LCS from Lockheed, LCS-3, under a $197.6 million cost-plus-incentive-fee/award-fee modification. Bollinger was to design and construct LCS-3 in partnership with Lockheed.

20.     The U.S. Navy announced on September 16, 2009 that it would "down-select" between the two industry teams—led by Lockheed Martin and General Dynamics—in FY 2010 and at that time would select a single prime contractor and permit only a single shipyard to construct up to ten LCS. This strategy posed a problem for Lockheed, as it had entered into teaming agreements with both Fincantieri and Bollinger and would be unable to comply with both agreements under the Navy's new strategy, as it would be permitted to use only one shipyard.

21.     To avoid a dispute as a result of the announced "down-select" strategy, Lockheed Martin acquired Bollinger's interest in its teaming agreement in December 2009 and MMC assumed responsibility for completing LCS-3 (and all remaining ships that Bollinger would have built). Since that time, Lockheed had a teaming agreement with only Fincantieri, and Fincantieri (through its MMC subsidiary) is Lockheed's exclusive teammate in the LCS program.

22.     As the sole shipyard where the Freedom class of the LCS is manufactured, MMC's capabilities are devoted to the production of LCS and LCS variants for the foreseeable future. MMC as it now exists would cease to operate without a continual flow of work under the LCS Program.  It is a multi-year effort to engineer a new vessel and begin manufacturing.  And certain equipment and raw materials necessary to construct ships, such as propulsion engines and steel, must be acquired well in advance of anticipated construction.  Thus, MMC and Fincantieri rely on Lockheed Martin to source sufficient LCS Program opportunities to maintain MMC's operations and keep its workforce employed.

### Under the Teaming Agreement, Lockheed Martin and Fincantieri Must Work Together Exclusively

23.     Unsurprisingly given MMC's substantial commitment to the LCS Program, Fincantieri and Lockheed Martin agreed to exclusively work together on it, with only Fincantieri having the unilateral right to withdraw from a proposal that it economically could not fulfill.

24.     Under the Teaming Agreement, Fincantieri and Lockheed Martin agreed to "team for the purposes of executing the LCS Program (including any LCS follow-on phases and *sales under the U.S. Government's Foreign Military Sales program to customers that utilize the basic LCS hull form*)" and to jointly pursue "on a case-by-case basis, other shipbuilding opportunities." Ex 1, Art. 1.1 (emphasis added). The LCS Program includes, in relevant part, "all other LCS ships *or adaptations thereof* built in the United States for the U.S. Navy and *for other customers under the U.S. Government's Foreign Military Sales program*." *Id.* Art. 2(C) (emphasis added).

25.     Thus, the Teaming Agreement explicitly provides that Fincantieri and Lockheed would team for purposes of sales of LCS and adaptations of the LCS design, including to foreign governments like Saudi Arabia, under the U.S. Government's Foreign Military Sales ("FMS") Program.

26.     Additionally, Fincantieri and Lockheed agreed to "in good faith carry out the obligations set forth" in the Teaming Agreement, including exerting "all commercially reasonable best efforts to secure selection of Lockheed as the prime contractor for Procurement and the selection and approval of the Marinette Shipyard as the subcontractor for the work set forth" in an attachment to the Teaming Agreement. *Id.* Art. 5.1.

27.     As a government contractor, Lockheed Martin must generally submit proposals in response to bid solicitations from the Government, with price often being one of the primary determining factors as to whether Lockheed would be awarded the proposed contract. Thus, Fincantieri and Lockheed agreed in the Teaming Agreement to mutually agree upon the price that would be submitted in response to LCS proposals, the so-called "Price-to-Win," with each proposing the price for their portion of the respective work.

28.     Specifically, Fincantieri and Lockheed Martin agreed to use "all commercially reasonable best efforts to support proposal preparation and negotiations," including collaborating "in establishing the Price-to-Win targets" necessary to win the proposed work. Ex. 1, Arts. 5.1 and 5.1.1. The Teaming Agreement also provides, among other things, that Fincantieri and Lockheed "shall work together to develop, propose, contract for, produce, sell, and support the LCS Program in a cost effective manner to provide the Customer with the best value . . . ." *Id.* Art. 5.2. The "Customer" is defined to mean the U.S. Navy, "including when it is acting on behalf of other customers under the U.S. Government's Foreign Military Sales Program." *Id.* Art. 2(B).

29.     Lockheed Martin may only propose a price for work under the Teaming Agreement without Fincantieri's agreement (and thus without Fincantieri's agreement to participate in a project if Lockheed was awarded the contract) if a specific and well-defined process is first followed and the parties are unable to reach agreement on their respective pricing.

30.     If the parties are unable to agree on a Price-to-Win target, "even after mutual efforts have been undertaken by each Party to reduce its price for its workshare, Lockheed reserves the right as the prime contractor to establish a reasonable Price-to-Win." *Id.* Art. 5.1.1. However, Lockheed may only do so subject to Fincantieri and MMC's "right to withdraw from that Procurement without liability, and *in such instance*, Lockheed Martin shall have the right to obtain proposals from other shipyards for that Procurement's shipyard workshare." *Id.* (emphasis added).

31.     Thus, according to the plain language of the Teaming Agreement, Lockheed Martin must include Fincantieri when preparing its Price-to-Win proposal and may obtain proposals from competing shipyards *only* if the following process is followed: (1) the parties attempt to use mutual efforts to reduce the price for their respective workshares to reach a competitive Price-to-Win; (2) they are unable to reach an agreement on a Price-to-Win; (3) Lockheed establishes a "reasonable

Price-to-Win"; and (4) Fincantieri exercises its right to withdraw from the Procurement. Then, and only in that instance, shall Lockheed "have the right to obtain proposal from other shipyards."

32.     The Teaming Agreement also contains a "dispute resolution" provision requiring the parties to arbitrate "any controversy or dispute arising under or related to" the Agreement, or concerning "an alleged breach" of it. *Id.* Art. 8.1. Disputes are to be governed by New York law. *Id.* Art. 17. Given the threat facing Fincantieri as a result of Lockheed's continuing breach of the Teaming Agreement—as discussed below—Fincantieri seeks a preliminary injunction to maintain the status quo pending arbitration, lest it suffer irreparable harm that moots an arbitral remedy.

### Lockheed Martin Has Previously and Improperly Sought Competing Proposals

33.     The Teaming Agreement logically contains prohibitions and restrictions on Lockheed Martin seeking proposals from, or undertaking work with, Fincantieri's competitors, given Fincantieri's and MMC's dedication to Lockheed and their substantial investment in the LCS Program. For example: Fincantieri has foregone prime contracting opportunities in exchange for the opportunity to team with Lockheed; MMC has scaled up its shipbuilding operation in Wisconsin to service LCS projects and employs 1,537 personnel dedicated to projects under the Teaming Agreement; and Fincantieri and MMC have invested $89 million into specialized buildings, equipment, and the development of technical know-how specific to the LCS under the Teaming Agreement.

34.     Despite Fincantieri's and MMC's unwaivering and investment-backed commitment, Lockheed Martin has repeatedly failed to live up to its end of the parties' partnership. Although not part of the claimed breaches in this Complaint, Lockheed's past disregard for the Teaming Agreement highlights Fincantieri's sensitivity to Lockheed's current misconduct.

35.     Beginning in May 2015, Lockheed Martin and Fincantieri pursued a proposal to sell MMSC vessels derived from the LCS design to the Kingdom of Saudi Arabia under the Teaming Agreement as part of the FMS Program.

36.     Throughout 2015 and into the Spring of 2016, Lockheed Martin and Fincantieri negotiated the pricing, manufacturing schedule, and other terms to prepare this proposal. Specifically, Fincantieri submitted Rough Order of Magnitude ("ROM") pricing proposals to Lockheed on July 10, 2015, July 30, 2015, and September 1, 2015.

37.     On January 11, 2016 Lockheed Martin informed Fincantieri that the Royal Saudi Navy and the U.S. Navy had responded to Lockheed's most recent ROM submission and proposed additional changes, including a request that the first ship be delivered by May 2021, five months earlier than initially proposed. Four days later, Fincantieri accommodated this requested delivery schedule, and on February 18, 2016 the U.S. Navy signed a Letter of Acceptance ("LOA") and forwarded that acceptance to Saudi Arabia. While this LOA was initially set to expire on April 30, 2016, to Fincantieri's knowledge it was extended to at least May 31, 2016.

38.     To Fincantieri's great surprise, Lockheed Martin informed it both orally and in writing in May 2016 that Lockheed had begun seeking proposals from competing shipyards for the Saudi MMSC opportunity. Lockheed's representative, Stephanie Hill, confirmed this in a May 15, 2016 letter to Fincantieri. By seeking these proposals from Fincantieri's competitors even though Fincantieri had not withdrawn from the proposal, Lockheed breached its obligations in the Teaming Agreement. Fincantieri so informed Lockheed in a letter dated May 23, 2016.

39.     Nevertheless, Fincantieri continued to attempt to cooperate with Lockheed Martin with regard to the Saudi MMSC opportunity. In a series of letters between June and August 2016, Fincantieri repeatedly confirmed to Lockheed that neither it nor MMC had withdrawn from this

proposal under the Teaming Agreement and reasserted their willingness to collaborate with Lockheed. In fact, during the same time period, Fincantieri and Lockheed continued to engage in discussions and share information about the "Price-to-Win" for the Saudi Opportunity.

40.      As sometimes happens during government contracting, the proposed MMSC project seemed to fade over time.  Lockheed Martin's last communication with Fincantieri regarding it, until recently, was in an August 24, 2016 letter. Fincantieri responded to that letter on August 30, 2016, but no response from Lockheed was received.  Indeed, communications between the parties concerning MMSC went dormant until they were resurrected with an announcement by the Trump Administration after the President's recent trip to Saudi Arabia, as discussed below.

41.      Despite the uncertainty surrounding the proposed Saudi MMSC project, Fincantieri continued to trust that Lockheed Martin was seeking opportunities under the Teaming Agreement to keep MMC's shipyard in operation and its employees employed. Fincantieri grew concerned, however, about what work it would perform between the projected end of production for the currently proposed domestic LCS, in 2017, and the beginning of the anticipated Frigate Program, projected to be awarded in 2020.  If Fincantieri were forced to stop production during this gap, the associated costs, including laying off workers and attempting to later rehire those workers that remained available, would make its proposal for the Frigate Program non-competitive. An inability to participate in the Frigate Program would be financially devastating to Fincantieri and MMC.

### The United States and Saudi Arabia Reached a Compromise for Four LCS-Derived MMSCs—the "Saudi Opportunity"

42.      On May 20, 2017, during a trip to Saudi Arabia, President Trump announced that he had signed a $110 billion agreement for various military sales to the Kingdom of Saudi Arabia (the "Saudi Opportunity"). Part of that announced agreement included the sale of four MMSCs for $1.4 billion. Lockheed Martin later advised Fincantieri that President Trump and Saudi Arabia

signed this LOA on May 18, 2017 after the U.S. Navy's International Program Office had unilaterally made further changes from Lockheed's original proposal.

43.     The award of these MMSCs was particularly fortuitous for Fincantieri and MMC. Because the MMSCs are adaptations of the LCS, approximately 18 to 24 months of engineering and design work must precede their construction. Thus, the MMSCs would provide substantial work for MMC's engineering and design staff now, and the construction of the MMSCs beginning around early 2019 would occupy MMC's shipyard during the gap from the end of the current LCS production run and the beginning of the Frigate Program construction.

### Lockheed Martin Refused To Provide Reasonable Assurances That It Will Fulfill Its Obligations Under the Teaming Agreement

44.     Because Lockheed Martin previously—and in evident violation of the Teaming Agreement—sought proposals from competing shipyards, Fincantieri recently sought reassurance from Lockheed that it would honor the Teaming Agreement now, and that MMC's shipyard would be used to construct these MMSCs for the Saudi Opportunity.

45.     On May 22, 2017, Francesco Valente, the President and CEO of the Fincantieri Marine Group, LLC (the immediate parent of MMC), sent an email to Stephanie Hill, Vice President & General Manager of Lockheed Martin's Cyber, Ships & Advanced Technology, to congratulate her on the award of the Saudi contract and to assure Lockheed that Fincantieri "remain[ed] committed to our relationship with you as a partner in meeting the customer requirements of the Saudi Opportunity." The email asked that she "confirm Lockheed's commitment to work with Fincantieri and MMC in the construction of the MMSCs." Lockheed did not respond to Fincantieri's request for confirmation of Lockheed's commitment to abide by the Teaming Agreement and work exclusively with Fincantieri.

46.     On June 5, 2017, Mr.   Valente sent a follow-up letter to Ms. Hill, again congratulating Lockheed Martin on the Saudi Opportunity.  The letter referenced Mr. Valente's May 22, 2017 email and again stated that Fincantieri "stand[s] ready to support Lockheed Martin in the design and construction of the MMSCs and request[s] that [Lockheed Martin] share all available information on the revised program as soon as received from the U.S. Navy."  The letter closed by asking for "prompt confirmation of Lockheed's commitment to work with [Fincantieri] and to your cooperation in scheduling a planning meeting no later than next week . . . ."  Lockheed did not respond to Fincantieri's request for confirmation of its commitment to work with Fincantieri.  Lockheed did, however, agree to meet with Fincantieri on June 13, 2017.

47.     Also on June 5, 2017, Theodore Epple, Senior Contracts Manager for Fincantieri Marinette Marine, sent a letter to Shaun McGraw, Senior Subcontracts Program Manager at Lockheed Martin, again congratulating Lockheed on the recent Saudi Opportunity.  The letter also cited Lockheed's obligations under Articles 1.3 and 5.2 of the Teaming Agreement "to contract to MMC for the design and construction of the four ships.  As MMC stands ready to support LM, it is requested that LM confirm its commitment to work with Fincantieri and MMC in the design and construction of the MMSCs."

48.     By letter dated June 12, 2017, Mr. McGraw responded to Mr. Epple's letter.  He admitted that Lockheed Martin had sought a proposal from a different shipyard, claiming falsely that MMC had "withdrawn" under the Teaming Agreement.  This statement was untrue and ignored Fincantieri's prior Saudi proposal, its efforts to work with Lockheed on that proposal, and its repeated reaffirmations of its commitment to the Saudi project in 2016.  Mr. McGraw's letter also did not reference the last letter Fincantieri sent to Lockheed in its 2016 correspondence—on August 30—which reiterated that neither Fincantieri nor MMC had withdrawn.

49.     Adding insult to injury, on June 13, 2017, Lockheed abruptly informed Fincantieri that it would not attend the meeting previously scheduled for that date.  Lockheed made no offer or effort to re-schedule.

50.     By letter dated June 13, 2017, Mr. Epple responded to Mr. McGraw.  He reiterated that neither Fincantieri nor MMC had withdrawn from the Saudi proposal, and requested a "written denial" that Lockheed Martin had "a commitment to another party to build the Saudi ships." Absent such a denial, Mr. Epple explained that Fincantieri would be forced to "assume that Lockheed Martin has entered into an agreement" with a different shipbuilder.

51.     On June 14, 2017, Mr. Valente met in Marinette, Wisconsin with Mr. Joseph North, Lockheed Martin's Vice President of Littoral Ship Systems.  During this meeting, Mr. North did not deny that Lockheed has been considering other third-party shipyards to build the MMSCs, rather than working with Fincantieri and MMC as required by the Teaming Agreement.

### Irreparable Injury to Fincantieri

52.     As described in the accompanying Declaration of Charles H. Goddard, Fincantieri (and MMC) will be irreparably injured unless Lockheed Martin is enjoined from awarding the subcontract to, or commencing the necessary work for the Saudi Opportunity with, any shipbuilder other than MMC in violation of the Teaming Agreement.  The cascading effects of such actions would foreclose Fincantieri's and MMC's ability to obtain any follow-on work received by Lockheed based upon the MMSCs designed for this project and, quite possibly, might result in Fincantieri and MMC losing the ability to obtain any work under the LCS Program at all due to the economic inefficiencies caused by idling its MMC shipyard in Wisconsin.  In short, the evils that would befall Fincantieri and MMC are the very definition of the type of irreparable harm for which injunctions are an appropriate remedy.

53.     The Saudi Opportunity subcontract requires designing and engineering a new vessel based upon the current LCS designs before the first MMSC can be built—an 18 to 24 month effort that will likely result in proprietary, if not patented, work product for which the shipbuilder would presumably have some ownership interest.  Fincantieri stands to lose approximately $1.4 billion in direct revenue between the engineering and construction phases if Lockheed Martin were to improperly award the Saudi Opportunity subcontract to a competitor.

54.     Moreover, Fincantieri and MMC would be foreclosed from follow-on work to the MMSC program.  Follow-on work in government contracting often occurs, which in this case could result from Saudi Arabia ordering additional MMSCs or another country ordering their own ships based upon the MMSC design.  In either event, if it is not involved in the engineering and design phases of constructing the first ships, Fincantieri could not economically bid for that work, even if such work was open for bidding from shipyards other than the incumbent.

55.     This is particularly true because without the MMSCs, Fincantieri might need to idle its entire MMC shipyard, increasing its costs and making its pricing for future work non-competitive. As the sole shipyard constructing the Freedom class of the LCS, Fincantieri and MMC have made substantial investments and specialized their operations to produce vessels based on the LCS design.

56.     As it now stands, construction of the currently ordered LCS will end in 2017, while construction of the next follow-on LCS-derived work, the Frigate Program, will not commence until 2021.  As Lockheed Martin's teammate, Fincantieri relied upon, and continues to rely upon, Lockheed to fill this production gap. If it does not do so, Fincantieri and MMC would face laying off *over 700* highly skilled engineers, supervisors, and laborers in Wisconsin, many of whom may not be available to be rehired if and when later work arises.  Fincantieri's fixed costs in the interim

would also require higher pricing on future work. With non-competitive pricing, Fincantieri would not only lose out on follow-on MMSC work, it would likely lose out on future LCS work or the Frigate Program. The damages to Fincantieri through such a cascade of events would be devastating and irreparable.

57.     Moreover, Fincantieri has no adequately calculable remedy at law for Lockheed Martin's improper award of the Saudi Opportunity subcontract to a competitor. Absent working on the subcontract from the beginning, there is great uncertainty as to whether Fincantieri and MMC could perform as-yet unidentified MMSC follow-on work or economically win future LCS Program work, or work under the Frigate Program. In addition to gravely injuring Fincantieri, the uncertain scope of harm renders it difficult to calculate monetary damages accurately, even if they were conceptually appropriate in lieu of an injunction.

58.     In sum, absent preliminary injunctive relief pending arbitration, Fincantieri will lose the ability to work on the Saudi Opportunity and likely all follow-on work with the U.S. Navy, which will devastate the company and its Wisconsin workforce. These damages cannot readily be adequately quantified *ab initio* and are irreparable in nature.

## CLAIMS FOR RELIEF

### COUNT ONE
### (Breach of Contract)

59.     Fincantieri hereby incorporates by reference the allegations made in Paragraphs 1-58 above, and realleges them as though fully set forth therein.

60.     The Saudi Opportunity is a solicitation through the LCS Program that will be issued through the U.S. Navy. The Teaming Agreement between Fincantieri and Lockheed Martin is an enforceable contract that imposes obligations on both parties related to the Saudi Opportunity. As explained in Article 5, "For all solicitations issued by the U.S. Navy for the LCS Program, the

Parties shall exert all commercially reasonable best efforts to secure selection of Lockheed as the prime contractor for the Procurement and the selection and approval of the Marinette Shipyard as the subcontractor . . . ." Ex. 1, Art. 5 (Teaming Agreement) at 7.

61.     Both Fincantieri and Lockheed Martin are sophisticated parties and the Teaming Agreement is a long-term commercial contract, signed in March 2008 and amended in April 2014.

62.     Lockheed Martin breached the Teaming Agreement in at least three ways under New York law, by: (1) soliciting other subcontractors for the Saudi Opportunity, without taking any action to ensure the "approval of the Marinette shipyard as the subcontractor"; (2) informing Fincantieri that it would not award the subcontract to MMC, without taking any action to ensure the "approval of the Marinette shipyard as the subcontractor"; and (3) by failing to provide reasonable assurances of performance following Fincantieri's three prior written requests.

63.     *First*, Lockheed Martin breached its obligation under Article 5 of the Teaming Agreement when—as it admitted by letter dated June 12 and during a meeting on June 14, 2017— it solicited proposals from other shipyards for the Saudi Opportunity subcontract after failing to take any action, let alone "all commercially reasonable best efforts," to ensure MMC was selected as the subcontractor, as required by the Teaming Agreement.

64.     *Second*, relatedly, Lockheed Martin anticipatorily repudiated its prospective Teaming Agreement obligations when it admitted that it intends to pursue the Saudi Opportunity with a shipyard other than MMC, again without taking any action, let alone "all commercially reasonable best efforts," to ensure MMC was selected as the subcontractor.

65.     These acts were consistent with and explain Lockheed Martin's refusal to provide assurances to Fincantieri that it would honor the Teaming Agreement, as requested in writing on May 22 and June 5, 2017. It is also consistent with Lockheed's prior breach in May 2016.

66.     Lockheed Martin's statement that it would pursue the Saudi Opportunity with a different shipyard was unequivocal.  This award of the subcontract to an entity other than MMC without taking any action, let alone "all commercially reasonable best efforts," to ensure MMC was selected as the subcontractor, would be a breach of the Teaming Agreement.

67.     *Third*, Lockheed Martin had previously repudiated the Teaming Agreement by failing to give reasonable assurances of performance after receiving three written requests for assurances from Fincantieri.

68.     Shortly after the Saudi Opportunity was finalized, Fincantieri had reasonable grounds for insecurity regarding Lockheed Martin's performance under the Teaming Agreement because of its recent, prior conduct.  Just one year prior, on a LCS-related procurement, Lockheed informed Fincantieri both orally and in writing that Lockheed had begun seeking proposals from competing shipyards for the Saudi Arabian LCS Program opportunity. Lockheed's representative, Stephanie Hill, confirmed this in a May 15, 2016 letter to Fincantieri's representatives. By seeking these proposals from Fincantieri's competitors before Fincantieri or MMC withdrew from the proposal (which they never did), Lockheed breached its obligations in the Teaming Agreement. Fincantieri informed Lockheed of this breach in a letter dated May 23, 2016.

69.     When the 2017 Saudi Opportunity was announced, similarly to the 2016 Saudi Arabian LCS Program opportunity, Fincantieri received no proactive communications from Lockheed Martin.  Fincantieri worried that again, Lockheed would attempt to bid the Saudi Opportunity subcontract to other shipyards, without first working with Fincantieri and MMC.

70.     In an attempt to alleviate Fincantieri's reasonable fears that Lockheed Martin may again attempt to breach the Teaming Agreement, Fincantieri requested reasonable assurances of Lockheed's performance under the Teaming Agreement through written correspondence on May

22, June 5, and June 13, 2017, directed to responsible representatives of Lockheed.  This correspondence went unanswered.

71.     Indeed, based on the letter of June 12 and the meeting of June 14, 2017, and given Lockheed Martin's unilateral cancellation of the meeting scheduled for June 13, 2017, it is clear that Fincantieri will *not* receive reasonable assurances of performance under the Teaming Agreement from Lockheed.  Lockheed's failure to respond—in addition to its other actions in breach—constituted a wrongful repudiation of the Teaming Agreement.

72.     Fincantieri will suffer actual injury as a proximate result of Lockheed Martin's actions and/or omissions, including the inability to bid on the current contract or subsequent, related follow-on work.  Fincantieri's damages include lost profits from the Saudi Opportunity. Injunctive relief is appropriate because the inevitable follow-on work has not yet been established and thus, damages are undefined. Moreover, the harm to Fincantieri (and MMC) would be irreparable in nature, given its magnitude and wide-ranging effects on the companies and their Wisconsin workforce.

73.     Fincantieri intends to arbitrate this cause of action as required by Article 8 of the Teaming Agreement, during the pendency of the preliminary injunction issued by the Court.

### JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Fincantieri demands a trial by jury in the event that the parties agree to waive arbitration and instead to proceed in this Court.

### PRAYER FOR RELIEF

Plaintiff Fincantieri respectfully requests that this Court enter judgment in its favor and against Defendant Lockheed Martin, as follows:

A. Preliminarily enjoin Lockheed from awarding a subcontract under the Saudi Opportunity to any shipyard other than MMC, or working on the Saudi Opportunity

with any shipyard other than MMC, in accordance with the Teaming Agreement, pending completion of the parties' arbitration of this dispute;

B.  Permanently enjoin Lockheed from violating the terms of the Teaming Agreement by awarding a Saudi Opportunity subcontract to any entity other than MMC, or working on the Saudi Opportunity with any subcontractor other than MMC;

C.  Alternatively, enter judgment in favor of Fincantieri and award Fincantieri monetary damages for the harm caused to it and MMC by Lockheed's breaches and repudiation of the Teaming Agreement, in an amount to be proved at trial;

D.  Declare and enter a judgment that Lockheed breached the Teaming Agreement;

E.  Award Fincantieri its attorney's fees and costs; and

F.  Grant such other and further relief as this Court deems just.

Respectfully submitted,

Vincent J. Napoleon (D.C. Bar No. 978692)
Vice President, General Counsel &
Chief Compliance Officer
**Fincantieri Marine Group, LLC**
55 M Street, S.E., Suite 910
Washington, D.C. 20003
Telephone: 202.488.4780
Facsimile: 202.488.4795
vincent.napoleon@us.fincantieri.com

Jason A. Levine (D.C. Bar No. 449053)
David R. Johnson (D.C. Bar No. 426305)
**VINSON & ELKINS LLP**
2200 Pennsylvania Avenue, N.W.
Suite 500 West
Washington, D.C. 20037-1701
Telephone: 202.639.6755
Facsimile: 202.879.8950
jlevine@velaw.com
drjohnson@velaw.com

*Attorneys for Plaintiff*
*FINCANTIERI S.p.A.*

Date: July 7, 2017